## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.                              Case No.: 8:14-cv-993-EAK-JSS

LAWRENCE N. WILKINS, CAROL G. WILKINS, THE WILKINS FOUNDATION, INC., and LIVING LIGHT MINISTRIES, INC.,

     Defendants.

## ORDER

On February 18, 2016, the United States of America, filed its operative, Second Amended Complaint ("**Complaint**") against the defendants, Lawrence and Carol Wilkins, the Wilkins Foundation, Inc., and Living Light Ministries, Inc. (collectively, "**Defendants**"), pursuant to 26 U.S.C. §§ 7401 and 7403. (Doc. 76). By its Complaint, the United States seeks to reduce to judgment the amount of unpaid federal income tax allegedly owed by Lawrence Wilkins (Count I) and to foreclose federal tax liens on real property allegedly belonging to Lawrence Wilkins but titled in the name of his alleged nominee, Living Light Ministries, Inc. (Counts II & III). Id. Count I was tried to a jury beginning on July 9, 2018. (Doc. 168). On July 17, 2018, the jury returned a special verdict, finding that Lawrence Wilkins had fraudulently failed to pay federal income taxes on hundreds of thousands of dollars of otherwise taxable income over the course of a decade. (Doc. 195). On August 7, 2018, the Court entered final judgment in favor of the United States and against Lawrence Wilkins in the total

Case No.:  8:14-cv-993-EAK-JSS

amount of $975,525.48, with interest thereafter in accordance with 26 U.S.C. §§ 6601, 6621, and 6622 and 28 U.S.C. § 1961(c), until paid.  (Doc. 206).

The remaining issues raised by the prayer for foreclosure of the tax liens and judicial sale of the real property described in paragraph four of the United States' Complaint[1] (Counts II & III) were set to be tried before the Court sitting without a jury.  By agreement of the parties and with the Court's approval, however, all evidence necessary for deciding those issues was admitted during the trial of Count I.  (Doc. 207 at 106:10–24).  At trial, five witnesses were sworn and testified.  The Court has carefully considered the testimony of Internal Revenue Service ("**IRS**") Agents Marjorie Kerkado, James Beck, and Kimberly Rogers, and Defendants Lawrence Wilkins and Carol Wilkins.  In addition, certain excerpts of the transcripts of the depositions of non-party witnesses were read to the jury and into the record.  The Court

---

[1] The real property upon which the United States seeks to foreclose its liens includes two improved parcels located in Sarasota County, Florida, both within the jurisdiction of this Court and described in the Compliant as follows:

> (a) Real property located at 5868 Malton Street, North Port, Florida, 34286-7111 (the "**Malton Street Property**"), more particularly described as Lot 23, Block 30, SECOND ADDITION TO NORTH PORT CHARLOTTE ESTATES, according to the Plat thereof recorded in Plat Book 19, Pages 44-440, of the Public Records of Sarasota County, Florida and Lot 24 Block 30, 2nd ADDITION TO PORT CHARLOTTE SUBDIVISION, according to the plat thereof, recorded in Plat Book 11, Pages 30 and 30A thru 30G, of the Public Records of Sarasota County, Florida.

> (b) Real property located at 5685 Bliffert Street, North Port, Florida 34287-2874 (the "**Bliffert Street Property**"), more particularly described as Lot 37, Block 2766, First Replat in Fortieth Addition to Port Charlotte Subdivision, a Subdivision according to the Plat thereof as recorded in Plat Book 26, Page(s) 33, 33A and 33B, inclusive, of the Public Records of Sarasota County, Florida.

(Doc. 76 at ¶4(a)–(b)).

has carefully considered the deposition testimony of Valerie Slone (Lawrence Wilkins'
ex-wife), Sharon Wilkins (Lawrence Wilkins' sister-in-law), and Ronald Wilkins
(Lawrence Wilkins' brother).   Finally, the Court has also considered the exhibits
admitted into evidence (Docs. 196, 198), the parties' written submissions (Docs. 218,
220), and, of course, the applicable law.   Accordingly, pursuant to Rule 52 of the
Federal Rules of Civil Procedure, the Court now enters the following findings of fact
and conclusions of law on the remaining issues.

## I.   Findings of Fact

### A.   Defendants

#### i.   *Lawrence and Carol Wilkins*

1.     Lawrence Wilkins is a serial tax defier who dislikes the federal
government and believes he is not subject to federal income taxation.  (Docs. 196-53,
209 at 183:4–184:3, 210 at 8:18–24, 211 at 10:24–13:16).

2.     Lawrence Wilkins contends that he is not a United States citizen but
rather "a living man created by [his] creator," and therefore he is not a "legal person"
subject to federal income taxation.  (Doc. 211 at 10:21–13:16).

3.     Lawrence Wilkins taught "classes" in Florida on "how to get out of
[paying] taxes."  (Doc. 209 at 183:11–12.)

4.     In 1992, Lawrence Wilkins stopped using his assigned Social Security
Number, claimed that he no longer had a Social Security Number, and attempted to
surrender his Social Security Number to the Social Security Administration.  (Doc.

Case No.: 8:14-cv-993-EAK-JSS

209 at 25:22–26:5, 183:18–22, 185:8–187:3).   Valerie Slone testified that this was because "[Lawrence Wilkins] didn't want to pay taxes." Id. at 186:22–187:3.

5.     Lawrence Wilkins has used "a lot of different names . . . over the years," including "Michael Edward," "Michael Brown," and "Anthony Wayne." Id. at 183:14–17, 191:1–6; (Doc. 211 at 197:9–18).   Lawrence Wilkins hosted a radio show using the alias "Michael Edward." (Docs. 209 at 183:14–17, 211 at 197:9–18). Lawrence Wilkins had packages intended for use at his prior business, the Honey Creek Club in McKinney, Texas, delivered to his home but addressed to "Michael Brown." (Doc. 209 at 192:9–193:1).

6.     Lawrence Wilkins married Valerie Slone on July 28, 1973. Id. at 166:9– 13. Lawrence Wilkins and Valerie Slone divorced in the early-1990s after a year-long separation. Id. at 166:20–169:17.   Lawrence Wilkins and Valerie Slone had three children together:  Byron Wilkins, born April 12, 1975; Christopher Wilkins, born March 20, 1978; and Meagan Wilkins, born March 26, 1986. Id. at 171:3–22.

7.     Lawrence Wilkins lived in Texas from 1977 to approximately 1990, when he moved to Florida. Id. at 167:4–14; (Doc. 210 at 36:20–25, 37:1–4).

8.     Lawrence Wilkins married Carol Wilkins on February 22, 1990.  (Doc. 210 at 105:24–106:4).   Lawrence Wilkins and Carol Wilkins had two children together: Cynthia (a/k/a "Hannah") Wilkins, born July 9, 1991; and Lawren Wilkins, born May 5, 1994. Id. at 106:12–20.

9.     Lawrence and Carol Wilkins have not filed federal income tax returns since at least 1994. (Docs. 196-169 at ¶B, 210 at 106:21–23, 211 at 13:17–20).

Case No.:  8:14-cv-993-EAK-JSS

10.    Lawrence Wilkins and his brother, Ronald Wilkins, are estranged. (Doc. 210 at 14:11–13).  Ronald Wilkins decided to distance himself from Lawrence Wilkins because "[Lawrence Wilkins] had gotten involved in some Christian warehouse banking and this Patriot movement and honestly thought George Bush was responsible for the 9/11 tragedy[.]"  Id. at 14:14–20.  Ronald Wilkins does not trust Lawrence Wilkins.  Id. at 24:15–21.

11.    Sharon Wilkins, Lawrence Wilkins' sister-in-law, does not trust or believe anything Lawrence Wilkins says because he has lied to Ronald and Sharon Wilkins "so many times." (Doc. 209 at 232:7–15).

    ii.    *Living Light Ministries, Inc.*

12.    Lawrence Wilkins obtained an advanced certificate in practical theology from the World of Faith Bible School in Farmers Branch, Texas, in 1982. (Docs. 198-13 at 1, 209 at 178:12–18, 212 at 43:23–45:6).

13.    Together with Valerie Slone and Doyle Davidson, Lawrence Wilkins co-founded and incorporated Living Light Ministries, Inc. ("**LLM**") in Texas on August 11, 1983. (Docs. 196-169 at ¶¶C–D, 209 at 173:22–174:16, 211 at 36:5–9, 212 at 6:15–17).

14.    LLM has a tax-exempt status as a not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code. (Doc. 196-69).

15.    Lawrence Wilkins prepared the application for tax exempt status dated November 8, 1984. (Doc. 196-68).  The application provided that "the primary function and principal activity of [LLM] is the conducting of religious worship services

5

with an emphasis on living a Christian life according to the written word of God, the Bible." Id.

16. For several years during the 1980s, LLM operated as a church in McKinney, Texas, with outreach missions to Mexico and Nigeria. (Docs. 196-169 at ¶D, 209 at 174:8–11, 176:9–22, 210 at 15:12–24). Lawrence Wilkins served as pastor of the church. (Docs. 196-169 at ¶E, 209 at 172:17–173:1, 173:24–174:7, 210 at 15:18–16:2). LLM held weekly services, some of which were led by Sharon Wilkins. (Docs. 196-169 at ¶E, 209 at 176:18–19).

17. LLM had approximately thirty parishioners. (Doc. 209 at 176:14–17). One of those parishioners was a man named Michael Edward Brown. Id. at 191:1–22. According to Lawrence Wilkins, Michael Brown later served as pastor of LLM in McKinney, Texas. (Doc. 211 at 197:19–22).

18. LLM also attempted to establish a "seed church" in Chicago, Illinois. (Doc. 211 at 205:20–24). That effort was led by pastors David Baer and his wife, LaDawn Baer. (Docs. 196-95, 211 at 45:23–46:9, 204:13–206:19). No evidence was offered or admitted at trial regarding the current status of this "seed church," and Lawrence Wilkins could not identify its current operating address. (Doc. 211 at 206:16–19).

19. LLM ceased operations in McKinney, Texas, in approximately 1988. (Docs. 196-169 at ¶D, 209 at 174:21–176:13, 218:10–20, 210 at 16:6–13, 202:3–10). Valerie Slone testified that this was due to Lawrence Wilkins' drinking problems. (Doc. 209 at 175:20–176:8). Sharon Wilkins testified that "[the church] just didn't

grow, and it disbanded." Id. at 218:14–20.  Ronald Wilkins testified that "[i]n the late

'80s, [Lawrence Wilkins] and [Valerie Slone] started having marital problems, and

. . . the church disbanded," after which point LLM, in its capacity as a church, "ceased

to exist."  (Doc. 210 at 16:6–25).

20.     In approximately 1990, Lawrence Wilkins relocated to Florida.  Id. at

37:1–6.

21.     Lawrence and Carol Wilkins testified that, at some point, LLM resumed

operations in Florida and currently operates out of the Malton Street Property.  Id. at

202:3–10; (Doc. 211 at 55:2–5).

22.     All religious activities occurring at the Malton Street Property are led by

Lawrence Wilkins.  (Doc. 196-169 at ¶G).  Religious activities do not occur on a

regular basis on the Malton Street Property, however, and no religious activities

occurred on the Malton Street Property in the seven months preceding the trial.  (Doc.

210 at 107:22–108:5, 224:8–13).

23.     LLM holds potluck fellowship meals and bible study approximately six

times per year at the Malton Street Property.  (Docs. 196-169 at ¶G, 210 at 108:7–9).

24.     LLM does not hold regular church services at the Malton Street Property.

(Doc. 210 at 108:10–12).  Lawrence Wilkins is the only pastor to have ever resided on

the Malton Street Property.  Id. at 108:13–23.  The Malton Street Property has no

signage to indicate the existence of a church.  Id. at 109:12–14.  LLM's religious

activities are not publicized, generally are attended by a small number of family and

friends, and are discovered only through word of mouth.  (Docs. 196-169 at ¶G, 210 at 109:8–11, 109:15–112:19).  No church bulletins are prepared.  (Doc. 196-169 at ¶G).

25.     Lawrence Wilkins testified that Michael Brown visited the Malton Street Property a total of three times – twice in the 1990s and once in 2007.  (Doc. 211 at 45:8–19).  However, Carol Wilkins has never seen Michael Brown at the Malton Street Property.  (Doc. 210 at 108:24–109:2, 222:6–8).

26.     Michael Brown does not conduct religious services at the Malton Street Property.  (Doc. 210 at 222:9–11).

27.     Lawrence Wilkins does not know Michael Brown's current whereabouts and has not communicated with Michael Brown since 2009.  (Doc. 196-51).

28.     LLM doesn't have a formal membership list.  (Doc. 210 at 223:15–17).  In a September 29, 2017 supplemental response to the United States' discovery requests, LLM affirmed that "there are *possibly* 50 *potential* [LLM] members" in Florida.  (Doc. 196-52) (emphasis added).[2]  However, LLM's supplemental response lists only thirty-seven individuals by name.  Id.

29.     LLM's supplemental response lists nineteen individuals by their first and last name:  Doyle Davidson; Valerie Slone; Richard Patterson; Michael Brown; David Baer; LaDawn Baer; Patrick Okonji; Jose Alaya; Helen Wilkins; Ronald Wilkins; Sharon Wilkins; P.J. Harris; Evelyn Corl; K.O. Corl; Cindi Lenartowicz; Reginald Asgill; Daniel Panacatl; Maria Panacatl; and Ambrosio Panacatl.  Id.  LLM's

---

[2] LLM's supplemental response was admitted into evidence as United States' Exhibit 57.

supplemental response lists eighteen individuals by their first name only:  "Michael"; "Suzie"; "Manuel"; "Roxie"; "Basiru"; "Rizwan"; "Thomas"; "Amelia"; "Jeffrey"; "Megan"; "Patrick"; "Victoria"; "David"; "Prince Mosheshe"; "Jose"; "Juan"; "Iris"; and "Erica."  Id.

30.    On direct examination at trial, however, Lawrence Wilkins conceded: (1) Doyle Davidson, Valerie Slone, Ronald Wilkins, and Sharon Wilkins are no longer affiliated with LLM in Florida; (2) Richard Patterson and Helen Wilkins are deceased; (3) Michael Brown, David Baer, LaDawn Baer, Jose Alaya, P.J. Harris, "Basiru," "Jose," "Juan," "Thomas," and "Amelia" do not regularly attend LLM activities or services in Florida; (4) Patrick Okonji, "Victoria," "David," and "Prince Mosheshe" live in Nigeria; (5) Reginald Asgill lives in Sierra Leone; (6) "Iris" lives in the Dominican Republic; and (7) Danielle Panacatl, Maria Panacatl, and Ambrosio Panacatl live in Mexico.  (Doc. 211 at 42:23–52:11).  Lawrence Wilkins could not recall the person identified as "Megan."  Id. at 51:5–6.

31.    For approximately one year after Lawrence Wilkins moved to Florida, Ronald and Sharon Wilkins gave Lawrence Wilkins permission to use their U.S. Post Office Box in Plano, Texas, for receiving mail addressed to Lawrence Wilkins or LLM until Lawrence Wilkins re-established in Florida and had an address of his own. (Docs. 209 at 220:1–5, 221:19–24, 210 at 22:1–23:16).  During that year, Ronald and Sharon Wilkins received mail addressed to Lawrence Wilkins, LLM, or both, and Sharon Wilkins would personally forward that mail to Lawrence Wilkins in Florida.

(Doc. 209 at 223:25–224:2, 225:9–14).  Sharon Wilkins does not recall to where she sent that mail.  Id. at 225:15–17.

32.    After the first year, Sharon Wilkins had a hold placed on the U.S. Post Office Box.  Id. at 222:13–16.  "[I]f anything came into the box with [Lawrence Wilkins'] name or [LLM], [the U.S. Postal Service was] supposed to send it back."  Id. Despite this, Lawrence Wilkins continued to have mail addressed to himself or LLM sent to Ronald and Sharon Wilkins' U.S. Post Office Box.  Id. at 224:15–17.  Sharon Wilkins continued to personally forward that mail to Lawrence Wilkins in Florida, and she would include a "note" requesting that Lawrence Wilkins cease having his mail sent to her U.S. Post Office Box.  Id. at 225:18–24.  This practice continued into the early-2000s.  Id. at 225:25–226:7.

33.    In the late-1990s and early-2000s, Ronald and Sharon Wilkins began to receive mail addressed to "Michael Brown" or "Michael Edward Brown," which the two believe to be Lawrence Wilkins' aliases.  Id. at 219:10–20, 223:13–225:8, 227:6– 7; (Doc. 210 at 23:1–6).  Eventually, Sharon Wilkins stopped personally forwarding to Lawrence Wilkins any mail addressed to Lawrence Wilkins, LLM, Michael Brown, or Michael Edward Brown.  (Doc. 209 at 226:8–18).

34.    In 2008 or 2009, Ronald and Sharon Wilkins obtained a second, new U.S. Post Office Box in Plano, Texas.  Id. at 229:17–230:3.  Ronald and Sharon Wilkins again began to receive mail addressed to LLM, Lawrence Wilkins, Michael Brown, or Michael Edward Brown.  Id. at 230:8–231:18.  Neither Ronald nor Sharon Wilkins authorized Lawrence Wilkins or anyone from LLM to use their second U.S.

Post Office Box, and Sharon Wilkins does not know how any of those individuals or entities obtained the address associated with the second U.S. Post Office Box.  Id. Sharon Wilkins did not personally forward mail addressed to LLM, Lawrence Wilkins, Michael Brown, or Michael Edward Brown; she would simply mark any such mail "Return to Sender."  Id. at 231:10–14; (Doc. 210 at 24:4–6).

35.    In discovery, Defendants produced a Statement of Change of Registered Office/Agent for LLM, which was filed with the Texas Secretary of State on March 19, 2010.  (Doc. 196-70).  Although Lawrence Wilkins does not know Michael Brown's current whereabouts and has not communicated with him since 2009, (Doc. 196-51), the document lists "Michael Edward Brown" as registered agent and changes LLM's business address from Sharon Wilkins' first U.S. Post Office Box in Plano, Texas, to her second U.S. Post Office Box in Plano, Texas, (Doc. 196-70).  The document bears the electronic signature of "Michael Edward Brown."  Id.  Lawrence Wilkins concedes he may have prepared the document.  (Doc. 211 at 52:15–56:11). At the time the document was filed, LLM was purportedly operating at the Malton Street Property in Florida, and neither Lawrence Wilkins nor Michael Brown had a key to either U.S. Post Office Box.  Id.

36.    Most of the documentary evidence offered by Lawrence Wilkins to establish the current existence of a bona fide church on the Malton Street Property consisted of photographs and other documents from religious events and activities occurring nearly four decades ago.  (Docs. 198-6–13).  Defendants did not offer into

evidence any photographs or other documents tending to show *recent* religious activities or events occurring on the Malton Street Property.

37.     Lawrence Wilkins is currently listed as LLM's registered agent. <u>See</u> Texas Comptroller of Public Accounts, Taxable Entity Search Results, https://mycpa.cpa.state.tx.us/coa/coaSearchBtn (last visited Feb. 21, 2019).

### iii.     *The Wilkins Foundation, Inc.*

38.     Lawrence Wilkins' mother, Helen Wilkins, incorporated The Wilkins Foundation, Inc. ("**WFI**") as a not-for-profit corporation in New Jersey on June 13, 1985.  (Docs. 196-93, 196-169 at ¶H).  WFI has a tax-exempt status as a not-for-profit organization under Section 501(c)(3) of the Internal Revenue Code.  (Doc. 196-94). WFI maintained its tax-exempt status until 2015, when WFI became inactive due to lack of funds.  (Docs. 196-169 at ¶M, 211 at 117:11–16).

39.     At the time Helen Wilkins, as President of WFI, submitted a Form 1023 Application for Recognition of Exemption to the IRS, the officers of WFI included: Helen Wilkins; Ronald Wilkins; Lawrence Wilkins; and Helen Wilkins' personal friend, financial advisor, and attorney, Peter Vandervoort.  (Docs. 196-93, 196-169 at ¶I, 210 at 6:15–21).

40.     The stated purpose of WFI was to grant scholarships or loans to deserving students; make contributions to colleges, schools, and other institutions operated exclusively for educational purposes; and to make contributions to organizations and institutions operated exclusively for charitable purposes.  (Docs. 196-92, 196-169 at ¶H).  That stated purpose never changed.  (Doc. 196-169 at ¶H).

41.    The original trustees of WFI included Helen Wilkins and Peter Vandervoort. Id.

42.    WFI also had an "international arm" – The Wilkins Foundation (SK) ("**WFISK**"). (Doc. 196-169 at ¶TT). WFISK had no source of income. Id. at ¶UU. At trial, Lawrence Wilkins testified that WFI and WFISK are "the same," and that WFISK is "just the Wilkins Foundation in New Jersey." (Doc. 211 at 132:8–10).

**B.    Helen Wilkins, Floyd Wilkins, and the Trusts**

43.    Helen Wilkins is the mother of Lawrence Wilkins and Ronald Wilkins. (Docs. 210 at 37:22–23, 41:4–10, 211 at 47:1–5).

44.    Helen Wilkins and her husband, Floyd Wilkins (Lawrence and Ronald Wilkins' father), owned and operated a successful business in Hawthorne, New Jersey, called Servo-Tek Products Company, which manufactured direct current motors and tachometer generators for the commercial aviation, computer, and machine tool industries. (Doc. 210 at 6:2–3, 40:3–12).

45.    In 1963, Floyd Wilkins created a living trust that, upon the death of Helen Wilkins, became payable to Lawrence Wilkins and Ronald Wilkins. (Docs. 196-127, 210 at 40:18–21, 211 at 146:20–147:1). Upon Floyd Wilkins' death in 1966, Helen Wilkins acceded to the trusteeship of Floyd Wilkins' living trust. (Doc. 207 at 148:22–149:5).

46.    On June 10, 1985, in New Jersey, Helen Wilkins created a living trust that she expected to be managed for her own benefit during her lifetime and then split equally between Lawrence Wilkins and Ronald Wilkins upon her death (the "**New**

**Jersey Trust**"). (Doc. 196-131). The New Jersey Trust appointed Midlantic Bank, N.A., Lawrence Wilkins, Ronald Wilkins, and Peter Vandervoort as trustees. Id.

47.    Helen Wilkins suffered a bout of severe strokes in 1991 while living in New Jersey. (Docs. 209 at 201:3–8, 232:16–235:6, 210 at 124:21–125:15, 211 at 145:7–146:12). Lawrence Wilkins then moved Helen Wilkins down to Venice, Florida, where she, for a time, resided in a condominium in Venice Acres located at 1202 Lexington Drive, Venice, Florida 34292 ("**1202 Lexington Property**"). (Docs. 196-131, 196-169 at ¶QQ, 210 at 37:10–17, 48:10–13, 124:21–125:1, 211 at 119:22–120:1). Lawrence and Carol Wilkins lived next door at 1206 Lexington Drive, Venice, Florida 34292 ("**1206 Lexington Property**"). (Docs. 196-169 at ¶QQ, 210 at 37:10–17, 169:1–8, 200:20–22, 211 at 119:22–120:1). At one point, WFISK owned both the 1202 Lexington Property and the 1206 Lexington Property. (Docs. 196-169 at ¶PP–RR, 208 at 123:8–133:12, 211 at 140:6–10). However, by resolution dated June 21, 2005, WFISK authorized the transfer (as a gift) of the 1206 Lexington Property to WFI. (Doc. 196-169 at ¶PP).

48.    After moving to Florida, Helen Wilkins suffered a series of mini-strokes, leaving her wheelchair bound, and her health began to deteriorate. (Docs. 209 at 233:12–20, 234:5–6, 210 at 116:17–117:15, 197:15–16). "A lot of the time [Helen Wilkins] was aphasic, meaning she couldn't speak." (Doc. 209 at 201:3–8, 211:16–212:10).

49.    Helen Wilkins required part-time care from 1991 to 2002. (Docs. 210 at 116:11–119:1, 211 at 145:7–146:12).

Case No.: 8:14-cv-993-EAK-JSS

50. Helen Wilkins' assets, including those associated with WFI and the New Jersey Trust, were originally managed by Peter Vandervoort. (Doc. 210 at 5:25–7:8). However, Peter Vandervoort ceased managing Helen Wilkins' affairs after Lawrence Wilkins fired him. Id.; (Doc. 209 at 197:18–198:1).

51. On June 8, 1995, Helen Wilkins gave Lawrence Wilkins a power of attorney to handle her personal and financial affairs. (Docs. 198-16, 209 at 235:9–11).

52. On July 20, 1995, in Venice, Florida, Helen Wilkins created a second living trust (the "**Helen N. Wilkins Family Trust**"). (Doc. 196-129). The Helen N. Wilkins Family Trust was meant to benefit Helen Wilkins exclusively during her lifetime and administered for that purpose. (Doc. 196-169 at ¶LLL).

53. Helen Wilkins, as settlor, appointed only Lawrence Wilkins and Ronald Wilkins as trustees—Peter Vandervoort was not appointed as a trustee. (Docs. 196-129, 196-169 at ¶KKK). However, on August 10, 1995, Lawrence Wilkins and Ronald Wilkins executed a "TRUSTEE RESOLUTION," giving Lawrence Wilkins sole authority, as trustee, to administer and act on behalf of the Helen N. Wilkins Family Trust. (Doc. 196-132). The resolution was Lawrence Wilkins' idea. (Doc. 210 at 54:19–23). After execution of the resolution, Ronald Wilkins never had any further communications with Lawrence Wilkins regarding the Helen N. Wilkins Family Trust. Id. at 56:17–20. Although Ronald Wilkins was aware of the existence of the Helen N. Wilkins Family Trust, he was not actively involved with its management and administration and did not make decisions about how its assets were invested. (Docs. 209 at 197:18–198:1, 210 at 45:10–46:17, 49:2–14, 50:15–19, 52:11–23).

15

54.     On November 2, 1995, Helen Wilkins, as grantor, revoked the New Jersey Trust and executed a release and waiver of accounting on November 26, 1995. (Doc. 196-131).   As of November 26, 1995, the New Jersey Trust had assets of $7,730,012.93.   Id.   Upon revocation of the New Jersey Trust, its assets were distributed to the Helen N. Wilkins Family Trust.   Id.; (Docs. 208 at 112:11–18, 211 at 207:10–208:4).

55.     From 2000 to 2005, Helen Wilkins was not involved in making her own financial decisions and primarily riled on Lawrence Wilkins' judgment.   (Doc. 211 at 145:25–146:12).

56.     Both Sharon Wilkins and Ronald Wilkins had concerns about Lawrence Wilkins' handling of Helen Wilkins' finances due to Lawrence Wilkins' extravagant lifestyle, including frequent travel and the home Lawrence Wilkins purchased in Venice, Florida, despite the absence of any source of income.   (Docs. 209 at 235:17–236:8, 210 at 4:24–5:19).

57.     By 2002, Lawrence Wilkins had moved Helen Wilkins into a nursing home in Venice, Florida.   (Doc. 209 at 234:9–14).

58.     When Sharon Wilkins last saw Helen Wilkins in 2002, Helen Wilkins was in "very poor" condition.   Id. at 232:16–235:6.   Helen Wilkins' mental state was compromised to the point that her memory was poor, and she did not initially recognize her family members.   Id.

59.     From approximately 2003 to her death in October of 2005, Helen Wilkins required full-time care.   (Docs. 210 at 116:11–119:1, 211 at 145:7–146:12).

Case No.: 8:14-cv-993-EAK-JSS

60.    During the last year of her life, Helen Wilkins suffered from dementia and was in "a near catatonic state." (Doc. 210 at 116:11–119:1, 124:7–11). Helen Wilkins would occasionally moan or groan but did not speak and generally did not recognize people. Id. at 116:11–119:1.

61.    Helen Wilkins died on October 25, 2005. (Docs. 196-126, 211 at 47:1–5).

### C.    Bank Accounts

62.    In 1995, Lawrence Wilkins opened and maintained an asset management account (*i.e.*, a "CAP" account, or a combined banking and investment account) with First Union Bank on behalf of the Helen N. Wilkins Family Trust (account number ending in "6081") (the "**Trust Account**"). (Docs. 196-133, 196-134, 211 at 27:15–29:6). Lawrence Wilkins and Ronald Wilkins had signature authority over the Trust Account as co-trustees of the Helen N. Wilkins Family Trust. (Docs. 196-133, 196-134).

63.    In 1995, Lawrence Wilkins opened and maintained a "warehouse bank account" with the Christian Patriot Association (the "**CPA Account**"). (Docs. 196-5–6, 196-57, 196-59–61, 211 at 18:18–20). The Christian Patriot Association advertised the advantages of so-called "warehouse banking": it "can protect your privacy by providing a bill-paying service through which you can pay bills without generating the normal paper trail in the Federal Reserve System, which is directly traceable back to you"; "[y]ou are outside the attempts of Government to establish a cashless society"; "your account is not legally subject to seizure by the IRS"; "each account is numbered"

to keep the identity of the account holder anonymous; and "records are not kept or reported." (Doc. 196-57 at 1–5). Lawrence Wilkins maintained the CPA Account through at least 2001. (Doc. 208 at 162:16–19).

64.    In 1995, Lawrence Wilkins opened and maintained a non-profit checking account at First Union Bank in the name of WFI (account number ending in "2244") (the "**WFI 2244 Account**"). (Docs. 196-41, 196-95, 196-169 at ¶NN, 211 at 25:24–27:13). Lawrence Wilkins had signature authority over the WFI 2244 Account. (Docs. 196-41); (Docs. 196-95, 196-169 at ¶NN, 211 at 25:24–27:13). Ronald Wilkins also had signature authority over the WFI 2244 Account. (Doc. 196-95). Lawrence Wilkins possessed the ATM card associated with the WFI 2244 Account, and he was the only person who made cash withdrawals from the WFI 2244 Account. (Doc. 211 at 123:9–21).

65.    In 1996, Lawrence Wilkins opened and maintained a Swiss bank account with Swiss Bank Corporation (the "**Swiss Account**"). (Docs. 196-63, 211 at 29:18–30:8). The Swiss Account was solely in Lawrence Wilkins' name, as trustee of the Helen N. Wilkins Family Trust, and funded by the Helen N. Wilkins Family Trust. (Docs. 196-63, 210 at 218:18–23, 211 at 208:5–23, 226:11–18).

66.    In 1997, Lawrence Wilkins opened and maintained a personal checking account at First Union Bank (account number ending in "5562") (the "**5562 Account**"), over which he had exclusive signature authority. (Docs. 196-55, 211 at 23:12–24:9).

67.    In 1998, Lawrence Wilkins opened and maintained a second personal checking account at First Union Bank (account number ending in "5403") (the "**5403 Account**"), over which he also had exclusive signature authority. (Docs. 196-29, 211 at 24:13–20).

68.    In 2002, Lawrence Wilkins opened and maintained a non-profit checking account at First Union Bank in the name of LLM (account number ending in "2215") (the "**LLM Account**").   (Docs. 196-39, 196-89, 211 at 24:21–25:23).   Lawrence Wilkins had signature authority over the LLM Account.  (Doc. 211 at 24:21–25:23). Michael Brown, David Baer, and LaDawn Baer also had signature authority over the LLM Account.  (Doc. 196-89).  Lawrence Wilkins possessed the ATM card associated with the LLM Account, and he was the only person who made cash withdrawals from the LLM Account.  Id. at 64:9–65:4.

69.    In 2004, Lawrence Wilkins opened and maintained a non-profit checking account at Fifth-Third Bank in the name of WFI (account number ending in "7745") (the "**WFI 7745 Account**").  (Docs. 196-49, 207 at 216:25–217:7, 209 at 57:19–58:3, 211 at 128:17–129:13).

**D.    Lawrence Wilkins' Control Over and Use of the Bank Accounts**

70.    Lawrence Wilkins made deposits into and paid bills from the CPA Account.  (Docs. 196-59–61, 211 at 22:17–23:2, 212 at 19:25–70:3).  Records evidencing deposits into the CPA Account totaling approximately $388,000 were admitted into evidence at trial.  (Docs. 196-5–6, 211 at 22:17–23:2).

71.     Between 1997 and 2002, Lawrence Wilkins made deposits into and paid bills from the 5562 Account and the 5403 Account.  (Docs. 196-7, 196-23–38, 211 at 23:3–24:12, 31:8–35:9).  Records evidencing deposits into the 5562 Account and 5403 Account totaling $3,075,042 were admitted into evidence at trial.  (Docs. 196-7, 196-23–38).

72.     Between May and June of 1997, Lawrence Wilkins, as sole trustee of the Helen N. Wilkins Family Trust and as signatory on the Trust Account, wrote and executed eight checks – totaling $850,000 – made out to "cash" and drawn on the Trust Account.  (Docs. 196-22–23, 208 at 28:23–32:2).  Lawrence Wilkins then deposited those checks into the 5562 Account.  (Docs. 196-22–23, 208 at 28:23–32:2).

73.     In 1998, Lawrence Wilkins made deposits of hundreds of thousands of dollars into the 5562 Account from the Swiss Account.  (Docs. 196-10, 196-26 at 2, 196-64, 196-65–66, 211 at 31:8–36:4).

74.     By the end of 2002, Lawrence Wilkins had drawn down and closed the 5562 Account and the 5403 Account.  (Docs. 196-161, 207 at 231:9–13).

75.     Between 2003 and 2005, Lawrence Wilkins made regular cash withdrawals, usually hundreds of dollars each, from both the LLM Account and the WFI 2244 Account.  (Docs. 196-40–41, 196-43, 196-47, 211 at 64:19–69:21).

76.     Between 2003 and 2005, Lawrence Wilkins transferred hundreds of thousands of dollars from the WFI 2244 Account to the LLM Account.  (Docs. 196-41, 196-43–44, 196-47, 211 at 75:7–77:3, 80:3–83:6, 101:9–102:10, 120:5–122:12, 125:20–128:16).  Lawrence Wilkins signed his own name to some of the checks drawn

on the WFI 2244 Account and appended an electronically-generated signature of Ronald Wilkins to others.  (Doc. 211 at 75:7–77:3, 80:3–83:6, 101:9–102:10, 120:5–122:12, 125:20–128:16).  Ronald Wilkins did not authorize Lawrence Wilkins to do so and was unaware of the fact that his signature was being appended to the checks. (Doc. 210 at 86:3–17).

77.     Between 2003 and 2005, the LLM Account and the WFI 2244 Account were used almost exclusively to pay the personal expenses of Lawrence Wilkins and his family, which totaled $221,646.53 in 2003, $338,424.53 in 2004, and $597,132.33 in 2005.  (Docs. 196-39–44, 196-46–47, 211 at 119:10–120:1, 124:21–125:19).

78.     Valerie Slone testified that the last time she saw Helen Wilkins, Helen Wilkins said to her, "Val, [Lawrence Wilkins has] stolen everything from me."  (Doc. 209 at 210:5–14).

**E.    Distribution from Floyd Wilkins' Living Trust to Lawrence Wilkins**

79.     Upon Helen Wilkins' death in October of 2005, Lawrence Wilkins and Ronald Wilkins each became entitled to a distribution of one-half of the balance of Floyd Wilkins' living trust.  (Doc. 211 at 146:20–147:1).  The trust account balance at the time was $3,896,363.33, which was held at a Paramus, New Jersey, branch of Wachovia bank.  (Docs. 196-126–127).

80.     On January 9, 2006, Lawrence Wilkins advised the branch's Vice President and Senior Trust Advisor, Janet Craig, that he would be gifting his share of $1,948,181.67 to WFI and LLM.  (Doc. 196-126).

81.     On January 16, 2006, Lawrence Wilkins executed an "ELECTION TO RECEIVE ASSETS IN CASH OR IN-KIND." (Doc. 196-127).  The election directed Wachovia to transfer Lawrence Wilkins' share of $1,948,181.67 to the LLM Account. Id.; (Doc. 211 at 150:12–151:11).

### F.     The Sale of the Lexington Properties

82.     WFISK sold the 1202 Lexington Property on May 8, 2003.  (Docs. 196-41 at 15, 42, 196-169 at ¶RR).  On May 13, 2003, the proceeds from the sale of the 1202 Lexington Property in the amount of $205,001.38 were deposited into the WFI 2244 Account.  (Doc. 196-41 at 15, 42).

83.     WFI sold the 1206 Lexington Property on August 23, 2005.  (Doc. 196-169 at ¶¶EE, SS).  On August 24, 2005, the proceeds from the sale of the 1206 Lexington Property in the amount of $507,841.85 were deposited into the WFI 2244 Account.  (Doc. 196-123 at 1–2).

### G.     The Malton Street Property

84.     Lawrence and Carol Wilkins currently reside at the Malton Street Property.  (Docs. 196-169 at ¶DDD, 210 at 105:17–18, 211 at 9:19–20).  The only individuals to ever occupy the Malton Street Property are Lawrence Wilkins, Carol Wilkins, Hannah Wilkins, and Lawren Wilkins. (Doc. 196-169 at ¶DDD).  Lawrence Wilkins' and his family have never paid rent to occupy the Malton Street Property. Id.  Carol Wilkins does not claim an interest in the Malton Street Property.  (Doc. 210 at 107:19–21).

85. The Malton Street Property consists of two separate, adjoining lots: 5868 Malton Street, North Port, Florida 34286 ("**Lot 23**"); and 5904 Malton Street, North Port, Florida 34286 ("**Lot 24**") (and together with Lot 23, the "**Lots**"). (Doc. 196-169 at ¶CCC). The Lots were purchased separately and then, within a two-year period, joined together for purposes of the Sarasota County tax exemption. (Doc. 211 at 151:22–152:16).

    *i. Lot 23*

86. WFI purchased Lot 23 on October 14, 2004 for $449,000. (Docs. 196-75, 196-77, 211 at 153:4–154:12). Lawrence Wilkins made the decision to purchase Lot 23. (Doc. 211 at 154:13–15). Ronald Wilkins was not aware that WFI had purchased or was in the process of purchasing Lot 23 and did not authorize the use of WFI funds to purchase Lot 23. (Doc. 210 at 66:16–19, 82:3–7).

87. A portion of the purchase price was financed by a loan obtained by WFI in the amount of $336,750. (Doc. 196-77). The loan was secured by a mortgage on the property. (Doc. 196-78). The loan application indicated Lot 23 was to be used as a "primary residence." (Doc. 196-76). Carol Wilkins signed the loan application on October 14, 2004 as Treasurer of WFI. Id. However, Carol Wilkins was not listed as an officer on WFI's 2004 Form 990-PF. (Doc. 196-111). WFI's 2004 Form 990-PF lists Helen Wilkins as "President and Director," Ronald Wilkins as "Vice President and Director," John Vanderveld as "Director," and Lawrence Wilkins as "Asst. Vice President." Id. Carol Wilkins is first listed as an officer of WFI on WFI's 2006 Form 990-PF, where she's listed as President, a role she obtained after the death of Helen

Case No.:  8:14-cv-993-EAK-JSS

Wilkins in October of 2005.  (Docs. 196-113, 196-169 at ¶HH).  The loan application also falsely lists Carol Wilkins as the owner of the 1206 Lexington Property.  (Doc. 196-76).  The 1206 Lexington Property was, in fact, owned by WFI.  (Doc. 196-169 at ¶PP).

88.     The $104,334.07 paid in "cash" for Lot 23 was paid by check drawn on the WFI 2244 Account.   (Docs. 196-44 at 65, 196-90).   The check bears the electronically-generated signature of Ronald Wilkins, appended by Lawrence Wilkins, and the freehand signature of Lawrence Wilkins.  (Docs. 196-44 at 65, 211 at 157:3–13).  Ronald Wilkins did not sign the check, did not authorize anyone to create or use an electronically-generated "stamp" of his signature, and did not authorize the $104,334.07 payment.  (Doc. 210 at 66:6–11, 80:25–81:15).

89.     The $15,000 in earnest money for Lot 23 was paid by check drawn on the WFI 2244 Account.   (Docs. 196-90, 196-44 at 60).   The check bears the electronically-generated signature of Ronald Wilkins, appended by Lawrence Wilkins. (Docs. 196-44 at 60, 211 at 155:14–17).  Ronald Wilkins did not sign the check, did not authorize anyone to create or use an electronically-generated "stamp" of his signature, and did not authorize the $15,000 payment.  (Doc. 210 at 66:6–11, 81:16–82:7).

90.     The $1,615 for title insurance on Lot 23 was paid by check drawn on the WFI 2244 Account.  (Doc. 196-44 at 63).  The check bears the electronically-generated signature of Ronald Wilkins, appended by Lawrence Wilkins.  Id.; (Doc. 211 at 156:15–17).  Ronald Wilkins did not sign the check, did not authorize anyone to create

24

or use an electronically-generated "stamp" of his signature, and did not authorize the $1,615 payment.  (Doc. 210 at 66:6–11, 86:3–17).

91.    On November 19, 2004, WFI sent a letter to "Michael E. Brown" as "Senior Pastor" of LLM, explaining that "[t]he Board of Trustees have agreed to donate the use of [Lot 23] to [LLM's] IRS 501(c)(3) recognized Church."  (Doc. 196-82).  The letter bears the electronically-generated signature of Ronald Wilkins as "Vice President" of WFI.  Id.  However, Ronald Wilkins has never seen the letter, never wrote, executed, or authorized the letter, did not authorize anyone to create or use an electronically-generated "stamp" of his signature, never had any conversations with Michael Brown regarding Lot 23 or the Malton Street Property, and was not aware that LLM operated a church in Florida in 2004.  (Doc. 210 at 66:6–11, 67:17–75:17).

92.    WFI made monthly mortgage payments on Lot 23 in the amount of $1,753.90 by automatic transfer from the WFI 7745 Account.  (Docs. 196-49, 196-84, 196-169 at ¶XX).  To fund those payments, WFISK made monthly tranfers (via check) of $1,800 from the WFI 2244 Account into the WFI 7745.  (Docs 196-49, 196-169 at ¶XX, 211 at 132:11–15).  The checks drawn on the WFI 2244 Account bear the electronically-generated signature of Ronald Wilkins, appended by Lawrence Wilkins.  (Docs. 196-49, 210 at 91:9–94:3).  However, Ronald Wilkins did not sign the checks, did not authorize anyone to create or use an electronically-generated "stamp" of his signature, and did not authorize the monthly deposits or mortgage payments.  (Doc. 210 at 66:6–11, 91:9–94:3).

93.     On March 14, 2006, LLM paid WFI $322,000 by check drawn on the LLM 2215 Account. (Doc. 196-80). The memo line reads, "5868 Malton St., North Port, Fla." Id. The check bears the signature of "M.E. Brown." Id. The funds were deposited into the WFI 7745 Account. (Doc. 196-84).

94.     On March 17, 2006, WFI sent a letter to the North Port, Florida, branch of Fifth Third Bank (the Lot 23 mortgage servicer), authorizing Fifth Third Bank to pay off the mortgage in full on or before Friday, March 31, 2006 at 2:00 p.m. (Doc. 196-84). The letter continues, "Sufficient funds have already been deposited in [the 7745 Account] so that you may draft the payoff directly from that account." Id. The letter bears the electronically-generated signature of Ronald Wilkins, in his capacity as "President" of WFI. Id. However, Ronald Wilkins was not the President of WFI in 2006. (Doc. 196-113). Additionally, Ronald Wilkins has never seen the letter, never wrote, executed, or authorized the letter, did not authorize anyone to create or use an electronically-generated "stamp" of his signature, never had any communications with Fifth Third Bank regarding the mortgage on Lot 23, was not aware of a mortgage on Lot 23, was not aware of the existence of the WFI 7745 Account, and did not know who exercised control over the WFI 7745 Account. (Doc. 210 at 75:18–78:2).

95.     On March 31, 2006, WFI paid the remaining $338,503.69 balance of the mortgage on Lot 23. (Doc. 196-169 at ¶YY).

96.     On May 31, 2006, Carol Wilkins, in her capacity as President of WFI, executed a "CERTIFICATE OF RESOLUTIONS, INCUMBANCY AND

Case No.:  8:14-cv-993-EAK-JSS

REPRESENTATIONS," authorizing the transfer (as a gift) of Lot 23 to LLM. (Doc. 196-86).

97.    By quitclaim deed dated May 31, 2006, WFI transferred Lot 23 to LLM. (Doc. 196-169 at ¶ZZ).  Carol Wilkins executed the deed in her capacity as President of WFI. Id.

ii.  *Lot 24*

98.    LLM purchased Lot 24 on December 27, 2005. (Doc. 196-169 at ¶BBB). The funds used to purchase Lot 24 were generated by the sale of the 1206 Lexington Property.  (Doc. 211 at 171:9–174:2).  Neither the United States nor Defendants introduced into evidence documents identifying the exact purchase price, but the purchase was funded, at least in part if not in whole, by a check in the amount of $238,174.42 made out to "Florida Abstract Security Title Corp." (Docs. 196-48 at 106, 196-169 at ¶BBB, 211 at 174:13–175:6).  The check was drawn on the WFI 2244 Account. (Docs. 196-48 at 106, 196-169 at ¶BBB, 211 at 175:7–9).  The check bears the electronically-generated signature of Ronald Wilkins, appended by Lawrence Wilkins. (Docs. 196-48 at 106, 196-169 at ¶BBB, 211 at 175:10–12).  Ronald Wilkins did not sign the check, did not authorize anyone to create or use an electronically-generated "stamp" of his signature, and did not authorize the $238,174.42 payment. (Doc. 210 at 66:6–11, 82:3–7).

### H.    The Bliffert Street Property

99.    Lawrence Wilkins' son, Christopher Wilkins, executed the purchase contract for the Bliffert Street Property on March 11, 2006. (Docs. 196-72, 196-169 at ¶FFF).

100.    The purchase price was $175,000. (Doc. 196-73). By check drawn on the LLM 2215 Account and dated March 20, 2006, LLM paid the remaining $172,385 balance due at closing. (Docs. 196-73, 196-169 at ¶GGG). The check bears the signature of "M.E. Brown." (Doc. 196-73).

101.    On March 22, 2006, Lawrence Wilkins sent an e-mail to the title agent handling the purchase of the Bliffert Street Property. (Doc. 196-71). In the e-mail, Lawrence Wilkins states that *he* paid for the Bliffert Street Property in full, and therefore only *he* had the right to designate how the property would be titled, stating, "I and ONLY I am the one who decides which name goes on the title according to equity law since I have paid for the property IN FULL." Id. (capitalization in original).

102.    By warranty deed dated April 6, 2006, Jean A. Beland transferred the Bliffert Street Property to LLM. (Doc. 196-74).

103.    Christopher Wilkins lived at the Bliffert Street Property. (Doc. 196-169 at ¶III).

104.    Carol Wilkins' sister, Cynthia Lenartowicz, also lived at the Bliffert Street Property for a number of years. Id. at ¶JJJ; (Doc. 211 at 180:17–19). Lawrence Wilkins authorized Cynthia Lenartowicz to live at the Bliffert Street Property. (Doc.

211 at 180:20–23).  Cynthia Lenartowicz did not pay rent to live at the Bliffert Street Property.  Id. at 180:10–12.

## I.   Animal Sanctuary

105.   During the time Lawrence Wilkins lived in Van Alstyne, Texas, Lawrence Wilkins and his then-wife, Valerie Slone, owned a 60-acre horse farm on which they bred Arabian horses.  (Docs. 209 at 179:8–17, 211 at 59:21–25).  Although not a formal business, Lawrence Wilkins and Valerie Slone operated the farm under the name "Heritage Arabians."  (Doc. 209 at 182:16–23).  Through Heritage Arabians, Lawrence Wilkins and Valerie Slone engaged in breeding horses, showing horses, and receiving stud fees.  (Doc. 211 at 60:1–8).  At its height, Heritage Arabians owned twenty-two horses.  (Doc. 209 at 179:21–24).  Lawrence Wilkins and Valerie Slone also raised and bred Suffolk sheep, peacocks, chickens, and cockatiels.  Id. at 178:24 – 180:5; (Doc. 211 at 60:1–2).  According to Valerie Slone, Heritage Arabians "didn't last that many years" because certain "tax changes" rendered operation of the farm unsustainable.  (Doc. 209 at 180:25–183:2).

106.   Although LLM's original Form 1023 included no mention of an animal sanctuary, at trial, Lawrence and Carol Wilkins testified that LLM, as part of its ministry, currently operates an animal sanctuary on the Malton Street Property, with a particular emphasis on horses.  (Docs. 210 at 206:24–210:5, 224:24–225:20, 226:7–17, 211 at 59:21–63:18, 229:18–231:12).  Carol Wilkins testified that the Malton Street Property currently houses eight horses.  (Doc. 210 at 209:14–15).  Other than this self-serving testimony of Lawrence and Carol Wilkins, however, Defendants offered no

evidence tending to show *current* operations of an animal sanctuary, whether as part of a ministry or otherwise, on the Malton Street Property. Rather, the only other evidence offered by Defendants at trial was a brochure, created by Lawrence Wilkins sometime in 2005 or 2006, and a 2006 LLM "year-end summary report." (Docs. 198-3–4, 212 at 47:16–50:23).

107. For its part, the Government offered the following evidence:

    a. Sharon Wilkins was told by either Lawrence or Carol Wilkins that the couple had bought a ranch, as a personal residence, in North Port, Florida, so they could "have horses." (Doc. 210 at 9:4–10:7). Sharon Wilkins was not told that the property was purchased to be used as a church or as an animal sanctuary. Id. at 10:8–14.

    b. Ronald Wilkins is not aware of the existence of a horse sanctuary on the Malton Street Property. Id. at 44:22–24.

    c. Since moving to the Malton Street Property, Lawrence Wilkins has purchased "three or four" Arabian horses at a cost of more than $10,000 each. (Doc. 211 at 60:9–12).

    d. On April 21, 2004, Lawrence Wilkins purchased two "breeding mares" – Arabian horses named UltraFina and Guadalmina – for $20,000. Id. at 60:24–63:7. Lawrence Wilkins also paid a $400 "stud fee" and registered the horses with the Arabian Horse Registry of America in May of 2004. Id. The $20,000 purchase price and the $400 stud fee were paid for by check drawn on the LLM Account.

(Doc. 196-45 at 107, 120).  Both checks bear the signature of "M.E. Brown."  Id.

    e.   Lawrence and Carol Wilkins' daughters, Hannah and Lawren Wilkins, took horseback riding lessons on UltraFina and Guadalmina at the Malton Street Property.  (Doc. 210 at 225:9–20).

    f.   Hannah and Lawren Wilkins considered UltraFina and Guadalmina to be "their horses."  Id. at 225:19.

    g.   Sharon Wilkins understood UltraFina and Guadalmina to be the "personal horses" of Hannah and Lawren Wilkins.  Id. at 10:20–11:16.[3]

## J.  Hearing Before the Value Adjustment Board

108.  On February 28, 2007, LLM applied for and subsequently received a religious-use property tax exemption (retroactively made effective beginning January 1, 2007) on the Malton Street Property.  (Doc. 196-88).

109.  In March of 2016, the IRS contacted Ms. Katherine Reardon, a property appraiser at the Sarasota County Property Appraiser's ("**SCPA**") office, regarding the

---

[3] In their brief, the United States included the following proposed finding of fact: "Both Lawren and Hannah Wilkins, Lawrence Wilkins' daughters, had horses at the Malton Street Property, one as a birthday present from her father."  (Doc. 218 at ¶76).  At closing argument, counsel for the United States made the following argument to the jury: "[Sharon Wilkins] testified that Lawrence Wilkins' daughters both rode horses at the Malton Street property and that one said that it was a birthday gift from her father – which again is inconsistent with the operation of an animal sanctuary."  (Doc. 212 at 133:25:-134:4).  Although Sharon Wilkins, in fact, testified at her deposition that she believed one of the horses was given to Hannah Wilkins as a birthday present, (Doc. 119-4 at 41:19–41:4), that portion of Sharon Wilkins' deposition was not read to the jury and into the record at trial.  Defendants did not object to counsel for the United States' argument to the jury.

Malton Street Property.  Id.  In response to the IRS's inquiry, Ms. Reardon and the SCPA opened an investigation into LLM's tax-exempt status as a qualified religious organization.  Id.  After conducting its investigation, the SCPA concluded that the Malton Street Property was not used "predominantly" for religious purposes and revoked the Malton Street Property's property tax exemption.  Id.

110.  LLM, through Lawrence Wilkins, appealed the SCPA's decision to the Florida Department of Revenue's Value Adjustment Board.  Id.  A Special Magistrate held a hearing on the matter on November 28, 2016.  Id.  At the hearing, the Special Magistrate received testimony and evidence from Lawrence Wilkins and the SCPA. Id.  Lawrence Wilkins testified as follows:

    a.  The Malton Street Property is a place of worship and had been for ten years;

    b.  The Malton Street Property consists of a single-family home occupied by Michael Edward Brown as a "parsonage";

    c.  Communion and bible study take place at the Malton Street Property;

    d.  The Malton Street Property is "a gathering place for the congregation";

    e.  "The congregation" consists of between 12 to 43 individuals "depending on the time of year";

    f.  LLM operates an animal sanctuary on the property, volunteers care for the animals, and donations cover the cost of the animals' upkeep;

Case No.:  8:14-cv-993-EAK-JSS

g. No one is paid for their services to LLM or the Malton Street Property.

Id.

111. After taking the matter under advisement, the Special Magistrate made the following factual findings, largely based on Lawrence Wilkins' own testimony and the lack of any contrary evidence from the SCPA:

a. LLM made an application for the religious use exemption in 2007 and supplied the necessary supporting documents;

b. "[N]othing has changed regarding the use of the [Malton Street Property] since the initial application in 2007";

c. The Malton Street property is currently in use as a parsonage and animal sanctuary and holds outdoor worship services, bible study, communion, and religious fellowship;

Id.

112. On those facts, the Special Magistrate concluded that LLM is an exempt entity, for purposes of the Sarasota County property tax exemption, that had used the Malton Street Property predominately for religious purposes in tax year 2016. Id.

**K.   IRS Tax Liability Examinations and Income Tax Assessments**

113. The IRS's Exam Division began its examination of Lawrence Wilkins' federal income tax liabilities for tax years 1996 to 1999 on February 27, 2001, after referral of the case from the IRS's Collection Division. (Doc. 207 at 167:9–12, 168:19–169:7, 170:2–5).

33

Case No.:  8:14-cv-993-EAK-JSS

114.   On March 5, 2001, IRS Agent Robert Sullivan sent Lawrence Wilkins a letter, explaining that he had not filed a Form 1040, U.S. Individual Tax Return, for tax years 1996 to 1999, notifying him that the IRS had commenced an examination of his federal income tax liability for those same tax years, and requesting that he submit his Forms 1040 and make an appointment within ten (10) days to meet with Agent Sullivan and provide records he used to prepare the Forms 1040.  (Doc. 156).  Agent Sullivan's letter was returned as "refused" by Lawrence Wilkins.  (Doc. 207 at 172:9–13).

115.   Agent Sullivan sent a second letter to Lawrence Wilkins on March 28, 2001, setting an appointment for Lawrence Wilkins to appear at the IRS's Sarasota, Florida, office on April 5, 2001 to discuss the non-filing of Forms 1040 for the 1996 to 1999 tax years.  (Doc. 156).  Lawrence Wilkins did not appear for the appointment. (Doc. 207 at 173:22–24).

116.   After Lawrence Wilkins failed to appear for appointments with Agent Sullivan, Agent Sullivan began searching for third parties to contact and banks to summon in order to determine if Lawrence Wilkins realized taxable income during tax years 1996 to 1999.  Id. at 176:15–21.

117.   The IRS later expanded its examination to include tax year 2000.  Id. at 176:22–177:6.  On May 22, 2001, Agent Sullivan sent a third letter to Lawrence Wilkins, explaining that he had not filed a Form 1040 for tax year 2000, notifying him that the IRS had commenced an examination of his federal income tax liability for that same tax year, and setting an appointment for Lawrence Wilkins to appear and

provide certain, delineated records.  (Doc. 158).  Lawrence Wilkins did not appear for

the appointment.  (Doc. 207 at 180:14–20).

118.    On January 4, 2002, after receiving multiple notices from the IRS

regarding the audit that commenced in March of 2001, Lawrence Wilkins wrote to the

IRS, seeking certified copies of LLM's application for tax exempt status and the IRS

letter granting tax exempt status.   (Docs. 198-2, 208 at 59:2–61:15).    The IRS

responded and confirmed LLM's tax-exempt status.  (Doc. 198-2).  During that same

time frame, Lawrence Wilkins sent a similar letter to the IRS with respect to the tax-

exempt status of WFI.  (Docs. 198-14, 208 at 59:2–61:15).  By letter dated January 3,

2002, the Internal Revenue Service affirmed that WFI maintained its tax-exempt

status.  (Docs. 198-2, 208 at 59:2–61:15).

119.    After Lawrence Wilkins failed to appear for the appointment with Agent

Sullivan, Agent Sullivan continued to search for additional third parties to contact and

banks to summon in order to determine if Lawrence Wilkins realized taxable income

during tax years 1996 to 2000.  (Doc. 208 at 181:13–182:1).

120.    The IRS ultimately expanded its examination to include tax years 1996

to 2005.  Id. at 188:7–11.  During its examination, the IRS sent out sixty-two (62)

summonses to third parties (including banks and other financial institutions) and

received hundreds of pages of bank statements, canceled checks, deposit items, and

other financial records for accounts held in Lawrence Wilkins' name or over which

Lawrence Wilkins had signatory authority or otherwise exercised dominion and

control.  Id. at 182:2–187:19.  The IRS's examination of Lawrence Wilkins' federal income tax liability ended in 2008.  Id. at 188:12–14.

121.   At no point during the IRS's examination did Lawrence Wilkins ever attend an appointment with IRS Agents, provide records pertaining to his income, or otherwise cooperate with the IRS.  Id. at 188:15–24, 230:15–231:2; (Doc. 211 at 14:9–15:9).

122.   For tax years 1996 to 2002, Agent Sullivan reconstructed Lawrence Wilkins' taxable income using a "bank deposit analysis."  (Docs. 207 at 187:16–19, 188:25–189:3, 208 at 8:11–16).  A bank deposit analysis entails calculating the total amount of deposits into an account and subtracting from that sum any deposits that do not represent taxable income or represent inter-account transfers.  (Docs. 207 at 189:4–19, 208 at 8:17–23).  The difference represents the taxpayer's taxable income.  (Docs. 207 at 189:4–19, 208 at 8:17–23).

123.   For tax year 1996, specifically, Agent Sullivan reconstructed Lawrence Wilkins' taxable income by calculating the total deposits into the CPA Account.  (Doc. 208 at 16:3–7, 24:9–15, 45:5–13).  For tax years 1997 to 2002, Agent Sullivan reconstructed Lawrence Wilkins' taxable income by calculating the total deposits into the 5562 Account and the 5403 Account.  (Docs. 207 at 187:16–19, 208 at 28:2–7, 37:2–38:3, 45:5–13).

124.   First Union Bank did not initially provide the IRS with bank records for the 5562 Account because Lawrence Wilkins had not provided the bank with his

Social Security Number when he initially opened the 5562 Account in 1997.  (Docs. 196-55, 207 at 186:1–23).

125.   Following Agent Sullivan's examination of Lawrence Wilkins' income tax liabilities for the tax years 1996 to 2002, on July 12, 2006, the IRS issued to Lawrence Wilkins a statutory notice of deficiency, along with attachments explaining the tax deficiencies (including penalties) determined for those tax years.  (Docs. 196-1–2).

126.   In 2006, a new IRS Agent, Agent Thomas Boehne, was assigned to Lawrence Wilkins' file.  (Docs. 196-161, 207 at 198:1–4).  Agent Boehne determined that, after Lawrence Wilkins drew down and closed the 5562 Account and the 5403 Account in 2002, Lawrence Wilkins began using WFI 2244 Account and the LLM Account to pay his and his family's personal expenses.  (Docs. 196-161, 207 at 231:3–12).

127.   For the remaining years under examination (*i.e.*, tax years 2003 to 2005), Agent Boehne reconstructed Lawrence Wilkins' taxable income using a "cash expenditure analysis."  (Docs. 207 at 188:25–189:3, 208 at 141:1–4).  A cash expenditure analysis entails calculating the amounts of cash paid by an individual for personal expenses, all of which is assumed to constitute taxable income.  (Doc. 207 at 190:8–23).  To conduct this analysis, Agent Boehne totaled the amounts of cash paid from the LLM Account, the WFI 2244 Account, and the WFI 7745 Account for Lawrence Wilkins' and his family's personal expenses.  (Docs. 207 at 188:25–189:3, 199:13–21, 216:18–21, 219:14–20, 208 at 141:1–4).  The resulting amounts were

attributed to Lawrence Wilkins as income.  (Docs. 207 at 188:25–189:3, 199:13–21, 216:18–21, 219:14–20, 208 at 141:1–4).

128.   Following Agent Boehne's examination of Lawrence Wilkins' federal income tax liabilities for tax years 2003 to 2005, on January 8, 2008, the IRS issued to Lawrence Wilkins a statutory notice of deficiency, along with attachments explaining the tax deficiencies, including penalties, determined for those tax years.  (Doc. 196-13).

129.   Lawrence Wilkins did not petition the United States Tax Court to redetermine any of the deficiencies the IRS proposed to assess for tax years 1996 to 2005.  (Doc. 209 at 12:9–11, 38:18–21).  A delegate of the Secretary of the Treasury thereafter assessed against Lawrence Wilkins over $7 million in unpaid federal income taxes, penalties, and interest for tax years 1996 to 2005.  (Docs. 196-137–196-146).

130.   A delegate of the Secretary of Treasury gave notice to Lawrence Wilkins of the assessments and made a demand for payment.  (Doc. 209 at 15:18–21).  Wilkins refused to pay, however, and, on April 25, 2014, the United States filed a civil complaint against Lawrence Wilkins and the other defendants.  (Doc. 1).  The United States filed its operative Complaint on February 18, 2016.  (Doc. 76).

131.   After a trial on the merits, the jury returned a special verdict, finding that Lawrence Wilkins had fraudulently failed to pay federal income taxes on hundreds of thousands of dollars of otherwise taxable income for tax years 1996 to 2005.  (Doc. 195).  The Clerk accordingly entered final judgment in favor of the United States and

against Lawrence Wilkins for unpaid taxes, penalties, and interest in the total amount of $975,525.48 as of July 25, 2018, with interest thereafter until paid.  (Doc. 206).

## II.   Conclusions of Law

### A.    Overview of Federal Tax Liens

1.     Pursuant to Sections 6321 and 6322 of the Internal Revenue Code, upon the assessment of a federal income tax deficiency against a taxpayer, a tax lien arises in favor of the United States as a matter of law, which attaches to all property in which the taxpayer holds an interest.  26 U.S.C. §§ 6321, 6322.  A district court may then foreclose the tax lien and force the sale of the property for the benefit of the United States.  26 U.S.C. § 7403(c).  See also United States v. Rodgers, 461 U.S. 677, 692–94 (1983).

2.     "The language of [Section 6321] 'is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have.'"  May v. United States, No. 07-10531, 2007 WL 3287513, at *1 (11th Cir. Nov. 8, 2007) (per curiam) (quoting United States v. Nat'l Bank of Commerce, 472 U.S. 713, 719–20 (1985)).  "Stronger language could hardly have been selected to reveal a purpose to assure the collection of taxes."  Nat'l Bank of Commerce, 472 U.S. at 720 (quoting Glass City Bank v. United States, 326 U.S. 265, 267 (1945)).

### B.    The Nominee Doctrine

3.     A tax lien attaches not only to property in which the taxpayer presently holds an interest, but also to any property held by the taxpayer's nominee.  G.M.

Case No.:  8:14-cv-993-EAK-JSS

Leasing Corp. v. United States, 429 U.S. 338, 350–51 (1977). "A nominee is one who holds bare legal title to property for the benefit of another." May, 2007 WL 3287513, at *1. Put differently, "[w]hen a taxpayer's property or rights to property are held in the name of another, or are transferred to another with the taxpayer retaining beneficial ownership, the third party is said to hold the property as a nominee for the taxpayer." United States v. Dornbrock, No. 0:06-cv-61669-KAM, 2008 WL 769065, at *4 (S.D. Fla. Jan. 17, 2008) (Gonzalez, J.), aff'd, 309 F. App'x 359 (11th Cir. 2009) (citation omitted).

4.    "The nominee [doctrine] has been utilized by the Eleventh Circuit for the purposes of imposing federal tax liens; it focuses on the delinquent taxpayer's relationship to the property, because the '[p]roperty of the nominee . . . of a taxpayer is subject to the collection of the taxpayer's tax liability.'" May, 2007 WL 3287513, at *1 (quoting Shades Ridge Holding Co. v. United States, 888 F.2d 725, 728 (11th Cir. 1989), as amended on denial of reh'g (Sept. 29, 1989)).

5.    "The 'nominee [doctrine] involves the determination of the true beneficial or equitable ownership of the property' at issue." Dornbrock, 2008 WL 769065, at *4 (quoting Oxford Capital Corp. v. United States, 211 F.3d 280, 284 (5th Cir. 2000)). "Focusing on the relationship between the taxpayer and the property, the [nominee doctrine] attempts to discern whether a taxpayer has engaged in a sort of legal fiction, for federal tax purposes, by placing legal title to property in the hands of another while, in actuality, retaining all or some of the benefits of being the true owner." Id. (quoting In re Richards, 231 B.R. 571, 578 (E.D. Pa. Jan. 29, 1999)

Case No.:  8:14-cv-993-EAK-JSS

(Buckwalter, J.)).  See also Shades Ridge Holding Co., 888 F.2d at 728; May, 2007 WL 3287513, at *1.

6.     "*Who really benefits from and controls the property is at the heart of a nominee case.*"  Dornbrock, 2008 WL 769065, at *4 (emphasis added).

7.     Nominee status does not depend on the finding of fraud.  United States v. Bollinger, 485 U.S. 340, 347–48 (1988).

8.     When the United States seeks to foreclose tax liens on property held by a taxpayer's nominee, the United States must prove the third party's nominee status. United States v. Hounsom, No. 6:14-cv-93-PGB-DAB, 2015 WL 6152964, at *4 (M.D. Fla. Aug. 11, 2015) (Byron, J.); Dornbrock, 2008 WL 769065, at *4.

9.     Federal courts generally look to state law to determine a third party's nominee status.  Dornbrock, 2008 WL 769065, at *5.  See also Drye v. United States, 528 U.S. 49, 58 (1999) ("We look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach.").

10.     While "Florida law recognizes that true ownership or an ownership interest may rest with a party who is not the titleholder of record," Towerhouse Condominium, Inc. v. Millman, 475 So.2d 674 (Fla. 1985), Florida law "provides no bright-line test for determining nominee status," Hounsom, 2015 WL 6152964, at *4. Therefore, federal courts apply federal law.  Id. (citing United States v. Ippolito, 838 F.Supp.2d 1287, 1291 (M.D. Fla. Feb. 14, 2012) (Scriven, J.); Dornbrock, 2008 WL 769065, at *5).  See also Grippo v. Perazzo, 357 F.3d 1218, 1222 (11th Cir. 2004) (explaining that where Florida law does not answer the question at bar, courts will

"look to federal law for guidance"); May, 2007 WL 3287513, at *3 (applying federal common law to determine the existence of a nominee relationship because Alabama law did not delineate a test for determining the "real intent" of a title transfer between spouses); Towe Antique Ford Found. v. I.R.S., Dep't of Treasury, U.S., 791 F. Supp. 1450, 1454 (D. Mont. Mar. 5, 1992) (Batton, J.), aff'd sub nom. Towe Antique Ford Found. v. I.R.S., 999 F.2d 1387 (9th Cir. 1993) (applying the test for nominee status used by other courts because no applicable law from the appropriate state could be found).

11.     Under federal law, "the determination of whether an individual is the nominee of the taxpayer is dependent upon the facts and circumstances of each case." Simpson v. United States, No. 3:87-cv-526-WTH, 1989 WL 73212 at *6 (M.D. Fla. Apr. 6, 1989) (Morton, J.) (citing United States v. Williams, 581 F. Supp. 756 (N.D. Ga. Sep. 29, 1982) (Tidwell, J.)).

12.     District courts in the Eleventh Circuit consider the following factors in determining whether property is being held by a nominee of the taxpayer:  (1) whether the taxpayer exercised dominion and control over the property; (2) whether the property of the taxpayer was placed in the name of the nominee in anticipation of collection activity; (3) whether the purported nominee paid any consideration for the property, or whether the consideration paid was inadequate; (4) whether a close relationship exists between the taxpayer and the nominee; and (5) whether the taxpayer pays the expenses (mortgage, property taxes, insurance) directly, or is the

source of the funds for payments of the expenses.  Hounsom, 2015 WL 6152964, at

*4; Ippolito, 838 F. Supp. 2d at 1291; Dornbrock, 2008 WL 769065, at *5.

13.   "Not all of the foregoing factors are of equal weight, and they 'should not

be applied rigidly or mechanically, as no one factor is determinative.'"  Dornbrock,

2008 WL 769065, at *5 (quoting In re Richards, 231 B.R. at 579).  See also Simpson,

1989 WL 73212 at *6.

14.   "The most critical issue is *who has substantial control over the property*."

Dornbrock, 2008 WL 769065, at *5 (citing Shades Ridge Holding Co., 888 F.2d at

728) ("The issue under either state or federal law depends on who has 'active' or

'substantial' control.")) (emphasis added).

### C.   The Alter-Ego Doctrine

15.   "A related principal to the nominee doctrine is the alter ego doctrine."

Id.  The two doctrines are very similar, but both are independent bases for attaching

the property of a third party in satisfaction of an individual's delinquent tax liability.

Id.; Eckhardt v. United States, No. 1:08-cv-21791-ASG, 2010 WL 11504339, at *5

(S.D. Fla. July 8, 2010) (Gold, J.), aff'd, 463 F. App'x 852 (11th Cir. 2012) (citing

Oxford Capital Corp., 211 F.3d at 284).  "While the nominee doctrine focuses on the

relationship between the taxpayer and the property, the alter ego doctrine focuses on

whether the taxpayer is similar to or controls another individual, trust, business, or

corporation."  Dornbrock, 2008 WL 769065, at *5 (citing Century Hotels v. United

States, 952 F.2d 107, 110 n.5 (5th Cir. 1992); Zahara Spiritual Trust v. United States,

910 F.2d 240, 245 (5th Cir. 1990)).  "If alter ego status is established, all of the assets

held by the taxpayer's alter ego may be liquidated to satisfy a delinquent tax debt." Eckhardt, 2010 WL 11504339, at *5 (citing Oxford Capital Corp., 211 F.3d at 284).

16. As to corporations, specifically, "[u]pon a sufficient showing that [a] corporation is the alter ego of the debtor, the corporation is treated as the debtor and its property may be attached[.]" Zahra Spiritual Tr., 910 F.2d at 244. This is commonly referred to as "reverse corporate piercing." In re Big Foot Props., Inc., No. 3:11-bk-6868-JAF, 2012 WL 6892645, at *4 (Bankr. M.D. Fla. May 25, 2012) (Funk, J.) (citing Estudios, Proyectos e Inversiones de Centro Am., S.A. (EPICA) v. Swiss Bank Corp. (Overseas) S.A., 507 So. 2d 1119, 1120 (Fla. 3d DCA 1987)). Reverse corporate piercing has been successfully applied in cases where the IRS seeks to attach to corporate assets to recover a taxpayer's delinquent tax liability. See, e.g., Shades Ridge Holding Co., 888 F.2d at 728; Towe Antique Ford Found. v. I.R.S., 999 F.2d 1387, 1393 (9th Cir. 1993); Eckhardt, 2010 WL 11504339, at *7.

17. Florida alter ego law governs the determination of alter ego status in the context of federal tax liabilities. Old W. Annuity & Life Ins. Co. v. Apollo Grp., 605 F.3d 856, 861–62 (11th Cir. 2010).

18. Under Florida law, to succeed under the alter ego doctrine and thus attach corporate assets to satisfy a debt owed, the plaintiff-creditor must establish that the defendant-debtor exerted a substantial degree of control over the corporation and used the corporate form fraudulently or for an improper purpose – namely, to avoid a pre-existing personal liability. See EPICA, 507 So. 2d at 1120–21 ("Where a creditor proves that a controlling shareholder organized or used the corporation to deceive or

defraud his personal creditors, the separate corporate existence will be disregarded and the corporation and the shareholder will be treated as one and the same."); Dania Jai-Alai Palace, Inc. v. Skykes, 450 So. 2d 1114, 1121 (Fla. 1984) (explaining that the corporate form must not be disregarded absent a showing that a corporation is used for some illegal, fraudulent, or unjust purpose which justifies piercing the corporate veil). See also Blasberg v. United States of America, No. 1:94-cv-1844-EBD, 1996 WL 788326, *3 (S.D. Fla. Aug. 15, 1996) (Davis, J.) (explaining that while "the separate identity of the corporation is usually recognized because the corporate form serves useful business purposes," under certain circumstances "justice and equity dictate that the separate corporate identity be ignored"); In re Checiek, 492 B.R. 918, 921 (Bankr. M.D. Fla. Jun. 10, 2013) (Williamson, J.) (citing Florida law and explaining that the "common thread" in reverse veil piercing cases is that the corporate form is being used improperly by the party against whom the veil piercing remedy is being sought); In re Big Foot Props., Inc., 2012 WL 6892645, at *4 (citing Florida law and explaining that "a corporation may be held liable for the debts of controlling shareholders, a remedy known as reverse corporate piercing, when the shareholders have formed or used the corporation to secrete assets and thereby avoid pre-existing personal liability").

19.    Actual fraud need not be shown. Eckhardt, 2010 WL 11504339, at *5 n.14 (citing Blasberg v. United States, No. 1:94-cv-1844-EBD, 1996 WL 788326, at *3 (S.D. Fla. Aug. 15, 1996) (David, J.); Sykes, 450 So. 2d at 1119).

Case No.:  8:14-cv-993-EAK-JSS

### D.    Application of Nominee Doctrine

20.    Application of the nominee doctrine's five factors establishes that LLM holds title to the Malton Street Property and the Bliffert Street Property as Lawrence Wilkins' nominee.

### i.   *Dominion and Control (First Factor)*

21.    Lawrence Wilkins exercises virtually exclusive dominion and control over the Malton Street Property.  Lawrence Wilkins made the decision to purchase the Malton Street Property, and Lawrence Wilkins and his family members have been the Malton Street Property's sole occupants since it was acquired in 2004 (Lot 23) and 2005 (Lot 24).  The Malton Street Property was purchased for the benefit of Lawrence Wilkins and his family.

22.    Defendants' contention that LLM is a bona fide church and that the Malton Street Property is predominately used for religious purposes and as an animal sanctuary is not credible.

23.    LLM no longer operates as a legitimate church.  There is no church membership, and there are no regular church services.  Religious activities, to the extent they occur, involve only a small number of family, friends, and neighbors. Nearly all the expenditures made from the LLM Account are used to pay the personal expenses of Lawrence Wilkins and his family.  Moreover, that the Malton Street Property is currently used as "parsonage" for either Lawrence Wilkins or Michael Brown, as Defendants contend, is belied by both Carol Wilkins' representation in official mortgage paperwork that the Malton Street Property was to be used as a

46

primary residence and Lawrence Wilkins' own admission that he has not seen or heard from Michael Brown since 2009.  The evidence that Lawrence Wilkins used in 2016 to convince the Special Magistrate otherwise was either patently false or completely contradicted by the evidence admitted at trial.

24.    Nor does the Malton Street Property operate as a legitimate animal sanctuary.  Lawrence Wilkins paid considerable funds, including stud fees, to purchase a handful of pure-bred Arabian horses, certified them with an official Arabian horse registry, and used them for his and his family's personal benefit, such as his daughters' horseback riding lessons.  These types of activities are more akin to Lawrence Wilkins' and Valerie Slone's prior business exploits in McKinney, Texas, than the operation of a sanctuary for old or injured horses.  The evidence Defendants introduced at trial to support a contrary conclusion either consisted of their own self-serving testimony or was well over a decade old.

25.    Lawrence Wilkins also exercises exclusive dominion and control over the Bliffert Street Property.  Even though Christopher Wilkins executed the purchase contract, Lawrence Wilkins conceded via his e-mail to the title agent that *he* paid for the Bliffert Street Property and only *he* had the right to designate how the property would be titled.  Additionally, Lawrence Wilkins permitted both Christopher Wilkins and Cynthia Lenartowicz to live in the property rent-free for several years.

Case No.:  8:14-cv-993-EAK-JSS

*ii.  Actions in Anticipation of Collection Activity (Second Factor)*

26.    Wilkins acquired both the Malton Street Property and the Bliffert Street Property in the name of WFI and LLM as part of his more than two-decade-long scheme to evade federal income taxation.

27.    Lawrence Wilkins is a serial tax defier who has not filed federal tax returns for more than two decades and who regularly espoused anti-tax and anti-government rhetoric.  Lawrence Wilkins failed to cooperate in the IRS's audits of his federal income tax liability, despite multiple opportunities to do so, and he did not provide the examining IRS Agents with any documentation or bases to conclude that the deposits into or expenditures from the accounts he controlled were not taxable to him as income.

28.    Lawrence Wilkins acted with intent to evade his federal tax obligations using a variety of schemes.

29.    In 1996 and 1997, Wilkins utilized the CPA Account to make deposits and pay his and his family's personal expenses with virtual anonymity.  The principal advantage of the CPA Account, as explained in the CPA's own literature, was that it protected an individual's assets from discovery and seizure by the IRS.

30.    Lawrence Wilkins also told Valerie Slone that he stopped using his Social Security Number in an effort to hide his income from the IRS.  And Agent Kerkado testified at trial that the 5562 Account (one of Lawrence Wilkins' two personal bank accounts) was not initially disclosed by First Union in response to the IRS's subpoena because Lawrence Wilkins' Social Security Number was not associated with the

account.  This suggests that Lawrence Wilkins intentionally refused to provide his Social Security Number to First Union in an effort to thwart collection.

31.    Lawrence Wilkins attempted to evade detection and collection by distancing himself from the entities he controlled and used to fund his and his family's personal expenditures, including the purchase of the Malton Street Property and Bliffert Street Property, such as by removing himself as a corporate figurehead, installing Carol Wilkins as an officer of WFI and using her to obtain the financing on the Malton Street Property, forging Ronald Wilkins' signature on checks and other corporate documents, and utilizing the name "Michael Brown" as an alias.

32.    An examination of the timeline shows that Lawrence Wilkins began using the non-profit WFI 2244 Account, WFI 7745 Account, and LLM Account only *after* he received notice of the commencement of the IRS's examination of his personal bank accounts, including the CPA Account, the 5562 Account, and the 5403 Account, in 2001.  The timing of events suggests that Lawrence Wilkins' use of the WFI 2244 Account, WFI 7745 Account, and LLM Account was intended to thwart the IRS and evade collection.  Although Lawrence Wilkins claims not to have received any of the notices the IRS mailed to him, the presumption of the regularity of the mail supports a finding that Lawrence Wilkins received the deficiency notices the IRS sent to the Malton Street Property, where Lawrence Wilkins admits he's lived since 2004.  That Lawrence Wilkins actually received the IRS's notices is further evidenced by the fact that, during the time period the IRS initially commenced its investigation into Lawrence Wilkins' federal tax liability, Lawrence Wilkins first verified that both LLM

and WFI retained their tax-exempt status before he began to utilize the WFI 2244 Aacount, WFI 7745 Account, and LLM Account to pay his and his family's personal expenses.  Specifically, in early-2002 Wilkins sought and obtained confirmation from the IRS that the tax-exempt status of LLM remained intact.  During the same time frame, a similar inquiry was made on behalf of WFI.  The timing of these actions suggest that Lawrence Wilkins used the WFI 2244 Account, WFI 7745 Account, and LLM Account to pay his and his family's personal expenses, as well as to purchase and hold the Malton Street Property and Bliffert Street Property, in an effort to evade federal income taxation.

33.    The jury found that Wilkins' failure to file tax returns for each of the 1996 through 2005 tax years was due to fraudulent intent.

34.    Taken together, these facts establish that Wilkins acted intentionally to conceal his income during the period in which the Malton Street Property and Bliffert Street Property were acquired, and that Lawrence Wilkins titled the properties in the name of LLM to evade collection of his federal tax liability.

iii. _Adequacy of Consideration and Source of Expenses (Third and Fifth Factor)_

35.    LLM paid no consideration for the Malton Street Property or the Bliffert Street Property.

36.    The funds used to purchase Lot 23 were provided by Lawrence Wilkins, not LLM.  Bank records show that the mortgage on the Malton Street Property was satisfied with funds that WFI "donated" to LLM after LLM transferred $322,000 to

WFI.  Lawrence Wilkins relies on that transfer from LLM to WFI to support his contention that LLM paid for the property.  However, that transfer occurred in March of 2006 – two months after Lawrence Wilkins transferred to LLM the entire $1.9 million distribution he was entitled to under his father's trust.  Thus, the evidence supports the finding that Lawrence Wilkins laundered his own funds by donating them to LLM (a tax-exempt entity) and then used those same funds to purchase Lot 23. Moreover, Lot 23 was transferred from WFI to LLM as a gift by quitclaim deed on May 31, 2006.  Carol Wilkins, as president of WFI, executed a resolution authorizing that transfer.  Thus, because no amount of consideration was actually paid by LLM, the amount of consideration LLM paid is necessarily inadequate.

37.    LLM paid no consideration for Lot 24.  Lot 24 was purchased by check drawn on the WFI 2244 Account, using funds generated by the sale of the 1206 Lexington Property (owned by WFI).  Given that Ronald Wilkins denies authorizing both the December 2005 purchase of Lot 24 and the use of his electronically-generated signature on the check, it's more likely than not that Lawrence Wilkens diverted WFI's funds to purchase the property for himself shortly after the death of his mother.

38.    As with Lot 23, the evidence supports the finding that Lawrence Wilkins purchased the Bliffert Street Property with his own funds after first laundering those funds through LLM.  The Bliffert Street Property was purchased in April of 2006 exclusively with tax exempt funds from LLM, which LLM possessed because Lawrence Wilkins had transferred his $1.9 million distribution from his father's trust

to LLM in January of that same year.  Moreover, Lawrence Wilkins admitted in the e-mail he sent to the title agent that *he* had paid the purchase price in full *himself.*

### iv. *Relationship Between Taxpayer and Nominee (Fourth Factor)*

39.     There is an extremely close relationship between Lawrence Wilkins and LLM, and there is no credible evidence that anyone other than Lawrence Wilkins controls LLM.

40.     LLM is the source of funds used to pay the personal expenses of Lawrence Wilkins and his family, and Lawrence Wilkins and his family were the primary beneficiaries of all expenditures from the LLM Account.  Lawrence Wilkins had signature authority over the LLM Account, possessed its ATM card, and made regular, large cash withdrawals.

41.     Although the signatures of both Lawrence Wilkins and Michael Brown appear on checks drawn on the LLM Account, it is more likely than not that the checks were signed by Lawrence Wilkins using "Michael Brown" (or "M.E. Brown") as an alias.  To be sure, Valerie Slone, Ronald Wilkins, and Sharon Wilkins all testified that Lawrence Wilkins uses the name "Michael Brown" as an alias.  Furthermore, no one other than Lawrence Wilkins claims to have seen Michael Brown at the Malton Street Property.  And in any event, Lawrence Wilkins conceded that Michael Brown only visited Florida three times – twice in the 1990s and once in 2007.  Thus, Michael Brown was not in Florida during the time frame when the checks were written to purchase either the Malton Street Property or the Bliffert Street Property.

42.     Although David and LaDawn Baer are signatories on the LLM Account and purportedly attempted to establish a "seed church" in Chicago, Lawrence Wilkins did not identify David and LaDawn Baer's current whereabouts or the current status of the "seed church," and he conceded that David and LaDawn Baer do not regularly attend LLM activities or church services in Florida.

43.     Therefore, the only conclusion to be drawn from the evidence is that Lawrence Wilkins, alone, controls LLM.

### E.     Application of the Alter-Ego Doctrine

44.     Lawrence Wilkins dominates and controls LLM to such an extent that LLM's independent existence is in fact nonexistent, and LLM is merely the alter-ego of Lawrence Wilkins.

45.     Lawrence Wilkins founded LLM and is currently listed as its registered Agent.

46.     Lawrence Wilkins opened and maintained the LLM Account, exercised complete control over LLM's funds, assets, and the LLM Account in general, made deposits and wrote checks on the LLM Account, and used LLM's funds for his and his family's personal benefit.

47.     Lawrence Wilkins also used the alias "Michael Brown" – the supposed "pastor" of LLM – including owning property, signing checks and documents, and maintaining a bank account under the alias, to aid in the concealment of his assets.

48.     Lawrence Wilkins intentionally holds no assets in his name and "donated" his entire $1.9 million share of his father's trust to LLM.

49.    Lawrence Wilkins likewise controlled WFI and the Helen N. Wilkins Family Trust, each of which made substantial, direct and indirect contributions of money and real property to LLM at Lawrence Wilkins' direction.  During the years in which Helen Wilkins' health was waning, Lawrence Wilkins fired Helen Wilkins' attorney and financial advisor, obtained a power of attorney to handle Helen Wilkins' personal and financial affairs, created a second trust in her name and obtained sole trusteeship over that trust, opened and controlled bank accounts in the trust's name, and transferred hundreds of thousands of dollars of trust funds into his personal bank accounts.  Additionally, Lawrence Wilkins effectuated the transfer of hundreds of thousands of dollars in cash and real property from WFI to LLM by both installing Carol Wilkins as an officer of WFI and forging Ronald Wilkins' signature on checks and other corporate documents.

50.    In sum, the evidence overwhelmingly supports the conclusion that LLM serves no legitimate purpose, and that Lawrence Wilkins intentionally uses LLM as an alter ego to fraudulently avoid his federal income tax liabilities.

## III.    **Conclusion**

Accordingly, it is

**ORDERED** and **ADJUDGED** as follows:

1.    The United States has met its burden of proving that LLM is the nominee and alter ego of Defendant Lawrence Wilkins, and that Lawrence Wilkins is the true beneficial and equitable owner of the Malton Street Property and the Bliffert Street Property;

page

Case No.:  8:14-cv-993-EAK-JSS

2.      The United States has a valid tax lien against Lawrence Wilkins, which attaches to all property and rights to property of Lawrence Wilkins, including the Malton Street Property and the Bliffert Street Property;

3.      The Malton Street Property and the Bliffert Street Property shall be sold at foreclosure to satisfy Lawrence Wilkins' tax liabilities, as reflected in the August 7, 2018 Final Judgment (Doc. 206);

4.      On or before the forty-fifth (45th) day after entry of this Order, the United States is directed to submit a decree of foreclosure and proposed order of sale, not inconsistent with this Order, which shall address:  (1) the current assessment amount; and (2) the procedures and details of the sale;

5.      The Clerk shall enter judgment in favor of the United States on Count II and Count III of the Complaint (Doc. 76); and

6.      The Clerk shall administratively close the case.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida this 26th day of February, 2019.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel/Parties of Record